IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOAA VOLLMAR,<br><br>    Plaintiff,<br><br>  v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation and DOES 1-20,<br><br>    Defendants.<br>_____/ | No. C-11-0629 MMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is defendant International Business Machines Corporation's ("IBM") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, filed July 2, 2012. Plaintiff Doaa Vollmar ("Vollmar") has filed opposition, to which IBM has replied. The matter came on regularly for hearing August 3, 2012. H. Larry Elam, III appeared on behalf of Vollmar. Mitchell F. Boomer appeared on behalf of IBM. Having read and considered the parties' respective written submissions, and for the reasons stated on the record at the hearing, the Court rules as follows.

## BACKGROUND[1]

Vollmar joined IBM in 2000 as part of an acquisition. (Boom Decl. Ex. P at 304:15-

---

[1] The facts set forth below are derived from the declarations, deposition transcripts, and exhibits submitted by the parties, and either are not in dispute or are "viewed in the light most favorable to the party opposing the motion." See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

16 ("Vollmar Depo.").) Vollmar worked in IBM's Learning Delivery group, which is responsible for organizing, scheduling, coordinating, tracking and delivering a variety of IBM training and learning development programs to multiple internal IBM organizations. (See Valle Decl. ¶ 2.) For most of her career with IBM, Vollmar worked as a "Delivery Focal Point" ("DFP"). (See Vollmar Depo. at 28:13-29:5.) DFPs are responsible for coordinating all aspects of the training for the specific IBM department to which they are assigned. (See Vollmar Depo. at 28:15-23, 32:20-34:1; DiManno Decl. ¶ 3.) At the time of her termination, Vollmar was a "Band 8" level employee, a designation based on her skill and experience level. (See DiManno Decl. ¶ 21.) Vollmar's direct supervisor in 2009 and 2010 was Erin DiManno ("DiManno"), who in turn reported to Crystal Valle ("Valle"). (See id. ¶ 2.)

In 2008, the Learning Delivery group took responsibility for a training program entitled Leadership Development. (See id. ¶ 5.) Vollmar requested the position of program manager for Leadership Development, and was recommended for the position by her former manager, John Harmon ("Harmon"). (See id. ¶ 6.) Vollmar acted as program manager from January 2009 to April 2009. During that period, a number of problems with scheduling arose. (See DiManno Decl. ¶ 8; Vollmar Depo. at 335:24-336:23.) On April 5, 2009, Harmon sent Vollmar an email about one such breakdown in IBM's scheduling process. (See Vollmar Depo. Ex 23.)

In April 2009, Vollmar began developing pain in her neck, arms and back. On April 20, 2009, Vollmar's physician placed her on medical leave. (See Vollmar Depo. at 59:6-15.) Vollmar did not return from leave until September 20, 2009. (See id. at 76:3-4.) In July 2009, while Vollmar was out on leave, Beth England ("England"), an employee with the Human Resources ("HR") Department, advised DiManno that if the Learning Delivery group believed it needed additional personnel, DiManno could post Vollmar's position and find a replacement once Vollmar's 12 weeks of Family Medical Leave Act ("FMLA") leave expired. (See DiManno Decl. ¶ 12.) DiManno phoned Vollmar on July 15, 2009 and told Vollmar she planned to post the position if Vollmar did not return when her FMLA leave expired.

2

(See id.)  After Vollmar reacted negatively to that news, DiManno "questioned this idea [herself]" and sought further advice from Dottie Robinson, a registered nurse with the HR Department specializing in medical leaves, who informed DiManno the position should not be posted because Vollmar had filed a workers' compensation claim.  (See id.)  Within a few hours of the initial phone call, DiManno spoke with Vollmar again, told Vollmar she had made a mistake, apologized and told Vollmar her job would not be posted.  (See id.; Vollmar Depo. at 85:9-16, 268:9-15.)  Vollmar's job was never posted.  (See DiManno Decl. ¶ 12.)

Upon Vollmar's return from leave in September 2009, DiManno met with Vollmar to discuss the problems with Vollmar's performance as a program manager that had developed prior to her disability.  (See DiManno Decl. ¶ 16.)  Vollmar disagreed with the negative feedback.  (See id.)  Also, during Vollmar's transition back to work, DiManno told Vollmar "we need to make you whole."  (See DiManno Decl. ¶ 14.)

Thereafter, at the end of 2009, DiManno prepared Vollmar's year-end performance evaluation.  As part of the evaluation, DiManno gave Vollmar an overall rating of "2," which translates to "solid contributor."  (See DiManno Decl. ¶¶ 8, 19.)  Vollmar disagreed with the rating and asked DiManno to review a number of e-mails in which colleagues had thanked Vollmar for her work.  (See DiManno Decl. ¶ 20.)  DiManno reviewed the emails, but did not change her opinion of Vollmar's work.  (See id.)

In April 2010, IBM terminated Vollmar's employment as part of a reduction in force.  (See Valle Decl. ¶¶ 13-14; DiManno Decl. ¶¶ 21-23.)  In particular, starting in 2009, the Learning Delivery group experienced a series of such reductions as a result of IBM's relocating the group's work off-shore (see Valle Decl. ¶ 7); of the three managers for Learning Delivery based in the United States, only one remained and of the forty-nine DFPs based in the United States, only eight remained.  (See id.)  Thereafter, in January 2010, Valle instructed DiManno to reduce her staff by two "Band 8" employees.  (See Valle Decl. ¶ 13; DiManno Decl. ¶¶ 21, 22.)  DiManno reviewed the performance of the three eligible "Band 8" employees: Vollmar, Marie Hyder, and Linda Reuss.  DiManno rated

3

Vollmar as having the weakest skill set of the three, and selected Vollmar and Hyder for layoff.  (See DiManno Decl. ¶ 23, Ex. D.)  On March 1, 2010, DiManno informed Vollmar she had been selected for layoff and, on April 12, 2010, Vollmar's employment was terminated.  (See Vollmar Depo. 261:3-262:3.)

Based on the above, Vollmar brings against IBM claims alleging violations of California's Fair Employment and Housing Act ("FEHA"), specifically, disability discrimination, failure to engage in the interactive process, failure to reasonably accommodate, retaliation, failure to take all reasonable steps to prevent discrimination, and wrongful termination in violation of public policy.[2]

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

---

[2] On June 28, 2012, the parties stipulated to dismissal of Vollmar's claims for harassment, breach of contract, and breach of the implied covenant of good faith and fair dealing.

4

"[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

**DISCUSSION**

**A.     Disability Discrimination**

Under FEHA, it is unlawful for an employer to discriminate against any person because of a physical or mental disability. See Cal. Gov. Code § 12940(a). "When entertaining motions for summary judgment in employment discrimination cases arising under state law, courts sitting in diversity must apply the McDonnell Douglas burden-shifting scheme as a federal procedural rule." Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011) (internal quotation and citation omitted). Under McDonnell Douglas, "the employee must first establish a prima facie case of discrimination." See id. Then, if the employee is successful, "the employer must articulate a legitimate, nondiscriminatory reason for the challenged action." See id. Finally, "if the employer satisfies this burden, the employee must show that the reason is pretextual[,] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." See id.

**1.     Prima Facie Case**

To establish a prima facie case of disability discrimination under FEHA, Vollmar must show "(1) [s]he suffers from a disability; (2) [s]he is otherwise qualified to do [her] job; and, (3) [s]he was subjected to adverse employment action because of [her] disability." Faust v. Cal. Portland Cement Co., 150 Cal. App. 4th 864, 886 (2007) (internal quotation and citation omitted). In order to survive a motion for summary judgment, Vollmar's "evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." See King v. United Parcel Service, Inc., 152 Cal. App. 4th 426, 433 (2007). A "plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact," however, "nor do uncorroborated and self-serving declarations." See id.

IBM concedes, for purposes of the instant motion, Vollmar can establish the first two elements of her prima facie case, i.e., that she suffered from a disability and was otherwise qualified to do her job. IBM argues, however, that Vollmar lacks evidence sufficient to create a triable issue of fact as to whether she was laid off because of her disability. In support of this third element, Vollmar relies on four items of evidence: (1) the July 15, 2009 phone call in which DiManno mistakenly told Vollmar her job would be posted; (2) the performance evaluation Vollmar received upon her return from disability leave; (3) DiManno's comment that "we need to make you whole"; and (4) Vollmar's 2009 annual review. The Court addresses Vollmar's showing below.

Vollmar first asserts the July 15, 2009 phone call evidences DiManno's discriminatory intent. Specifically, Vollmar argues, the call shows DiManno made plans to replace Vollmar with an employee who would be promoted from within. Vollmar presents no evidence, however, connecting any such asserted motive with Vollmar's disability. In particular, Vollmar submits no evidence showing DiManno wanted to replace Vollmar because she was disabled rather than because DiManno needed to fill a vacancy in her department. Indeed, as noted, the undisputed evidence shows DiManno acted independently to check the information she had received from the HR Department, and, at the first opportunity, corrected the mistake she made, apologized, and reassured Vollmar her job would not be posted. (See DiManno Decl. ¶ 12; Valle Decl. ¶ 12; Vollmar Depo. 85:9-16, 268:9-15.)

Vollmar next asserts DiManno's verbal critique of Vollmar's performance as a program manager, upon Vollmar's return from disability leave, evidences DiManno's discriminatory intent. Specifically, Vollmar argues IBM has not presented documentary evidence of negative feedback received before Vollmar went on leave in April 2009, and that DiManno invented performance problems to lay a foundation for Vollmar's later termination. Contrary to Vollmar's argument, however, the record contains undisputed evidence documenting such performance problems prior to Vollmar's taking disability leave. Vollmar's former supervisor, John Harmon, who recommended Vollmar for the program

manager assignment, sent on April 5, 2009 an email to Vollmar with a copy to DiManno, before Vollmar went out on leave, complaining of delays in the processing of requests for classes and other training and admonishing Vollmar regarding her time-management skills. Specifically, Harmon stated the group was in danger of "failing in [its] primary current responsibility of existing classes and requests" because Vollmar had essentially wasted the group's time in meetings spent in "planning for something happening a couple of months from [then]" when she should have been focused on pending requests. (See Vollmar Depo. Ex. 23.) Additionally, IBM has submitted undisputed evidence that, before Vollmar went on disability leave, DiManno and Valle received complaints about Vollmar's performance as a program manager. (See DiManno Decl. ¶ 7; Valle Decl. ¶ 8.) Although Vollmar has submitted a selection of emails thanking her for her work (see Vollmar Decl. Ex. 11), none of those emails contradicts the complaints other employees made about Vollmar's performance as a program manager.

Next, Vollmar asserts DiManno's use of the phrase "we need to make you whole," after Vollmar returned from disability leave, made Vollmar feel "[DiManno] didn't think [she] was a benefit to the team anymore because [she] was no longer performing the work of 2.5 full-time employees" (see Vollmar Decl. ¶ 31) and thus indicates discriminatory intent. Vollmar, however, provides no context for what otherwise is an ambiguous remark and DiManno states she intended only to convey her willingness to give Vollmar a chance to ease back into her work, i.e., to "gradually take on more responsibility until such time as she was released [by her doctor] to full time duties, rather than immediately launch into full time duties." (See DiManno Decl. ¶ 14.) Given Vollmar's failure to provide any other part of the conversation, Vollmar has failed to present evidence sufficient to raise an inference that DiManno used the phrase in any manner contrary to DiManno's description or in any manner evidencing discriminatory intent.

Vollmar's fourth and final item of evidence in support of her prima facie case is DiManno's annual evaluation of Vollmar's 2009 performance. As noted, DiManno gave Vollmar a rating of "2," which equates with "solid performance." (See Vollmar Decl. Ex. 9.)

7

Vollmar asserts that a rating of "2" was too low. DiManno's evaluation, however, was consistent with earlier evaluations in which Vollmar received a rating of "2," not only from DiManno but from other supervisors as well, long before Vollmar's disability. (See Vollmar Decl. Ex. 3 (2005 rating of "2" from supervisor Rosemarie Livigni), Ex. 4 (2006 rating of "2" from DiManno), Ex. 3 (2007 rating of "2" from Harmon).) Although Vollmar points out that her most recent prior rating was a "2+," equating with "above average contributor," that rating was for Vollmar's work as a DFP and not as a program manager.[3] Under such circumstances, Vollmar fails to show the "2" rating in 2009 evidences discriminatory intent.

Although in some instances, when otherwise insufficient individual items of evidence are considered "in the aggregate," they may suffice to raise a triable issue, see, e.g., Bergene v. Salt River Project Agr. Imp. and Power Dist., 272 F.3d 1136, 1143 (9th Cir. 2001), the evidence submitted here by Vollmar fares no better whether considered collectively or separately.

In sum, Vollmar has failed to introduce evidence sufficient to establish a prima facie case of disability discrimination.

**2.    Legitimate, Nondiscriminatory Reason for Vollmar's Termination**

IBM argues that, even assuming Vollmar has introduced sufficient evidence to establish her prima facie case, IBM had a nondiscriminatory reason for terminating Vollmar, namely, that Vollmar's department, the Learning Delivery group, was subject to a reduction in force in the course of IBM's relocation of positions overseas. As noted, the Learning Delivery group lost two of its three United States-based managers and thirty-one of its thirty-nine United States-based DFPs. (See Valle Decl. ¶ 7.) Reductions in force have been recognized as legitimate, non-discriminatory grounds for discharge. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000) ("A RIF [reduction in force] is a legitimate nondiscriminatory reason for laying off an employee.") Consequently, even

---

[3] As noted, Harmon, based on Vollmar's work as a DFP, initially recommended her for assignment as a program manager, but thereafter, prior to Vollmar's leave, expressed in writing grave concern about her ability to adequately perform the additional and varying duties required in that new assignment.

8

assuming a prima facie case, IBM has offered a legitimate, nondiscriminatory reason for Vollmar's termination, thus shifting the burden to Vollmar to raise a triable issue as to pretext.

### 3. Pretext

Vollmar does not dispute that she was terminated as part of a reduction in force. Rather, she argues she was selected for layoff as part of the reduction in force because of her disability.

"A plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840, 849 (9th Cir. 2004). Where, as here, a plaintiff's effort to show pretext is based on circumstantial evidence, the plaintiff's showing must be "specific" and "substantial." See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).

In attempting to show prextext, Vollmar relies on the same four items of evidence discussed above in connection with her prima facie case, and, as discussed above, none of that evidence suffices to raise an inference of discrimination. Moreover, although not required to do so, IBM has presented evidence demonstrating DiManno took a reasoned approach in deciding which two of the three "Band 8" employees would be selected for termination. Specifically, DiManno completed an IBM form that measured Vollmar's skills against the skills of the other two "Band 8" employees who could have been terminated. (See DiManno Decl. ¶ 13, Ex. D.) The three employees received similar overall scores in their evaluations, a mix of "2" and "2+" scores, but Vollmar and Marie Hyder received the lowest scores on the skills relevant to working in Learning Delivery. (See id. Ex. D.) The employee who was not laid off, Linda Reuss, was rated higher as to those skills, had acted as both a DFP and a project manager (see id. Ex. E), and, contrary to Vollmar, there is no evidence in the record suggesting her performance in the latter role generated any complaints or criticism.

9

Accordingly, IBM's motion will be granted as to Vollmar's cause of action for disability discrimination.

### B.      Failure to Engage in Interactive Process

Under FEHA, it is unlawful for an employer to "fail to engage in a timely, good faith interactive process with [a disabled] employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation." See Cal. Gov't Code § 12940(n). "The interactive process required by . . . FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively." Scotch v. Art Institute of California-Orange County, Inc., 173 Cal. App. 4th 986, 1010 (2009) (internal quotation and citation omitted). "Ritualized discussions are not necessarily required." See id.

Here, Vollmar asserts DiManno obstructed the interactive process when DiManno told Vollmar, while Vollmar was on leave, that no program manager positions were available for her to take upon her return. In her declaration, Vollmar asserts that, when she returned from leave, she "found out" a coworker named Audrey Estes was promoted to program manager, and "this confirmed to [Vollmar] that [DiManno] was not truthful and did not want [Vollmar] to return." (See Vollmar Decl. ¶ 27.) Vollmar fails, however, to provide any factual foundation as to how she came to such conclusion, nor does she state when she voiced her question to DiManno, when the program manager position assertedly became available, or whether she would have been qualified for that assignment. Without such additional evidence, Vollmar fails to show DiManno was "not truthful" in connection with her inquiry, nor has Vollmar shown DiManno, or anyone else at IBM, otherwise failed to engage in the requisite interactive process. See Scotch, 173 Cal. App. 4th at 365-66 (affirming summary judgment on claim of failure to engage in interactive process, where plaintiff failed to identify an accommodation that would have been available at time interactive process assertedly should have occurred).

Indeed, the undisputed evidence shows that IBM and DiManno engaged with

10

Vollmar in an interactive process, resulting in IBM's granting Vollmar leave, following the recommendations of Vollmar's doctor, and developing a plan to facilitate Vollmar's return to work. Further, IBM gave Vollmar five months of fully paid leave, more than the amount required by FMLA. Upon Vollmar's return to work, IBM provided training to help her transition back to the DFP assignment, approved a reduced work schedule in accordance with her doctor's restrictions, and lifted those restrictions only after her doctor cleared her to work full time. (See DiManno Decl. ¶¶ 13-14.) Vollmar offers no evidence to show such efforts were deficient in any manner.

Accordingly, IBM's motion will be granted as to Vollmar's cause of action for failure to engage in an interactive process.

### C. Failure to Provide Reasonable Accommodation

Under FEHA, it is unlawful for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." See Cal. Gov't Code § 12940(m). "The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." Scotch, 173 Cal. App. 4th at 1010. A "reasonable accommodation" is "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." See id.

At the hearing on the instant motion, Vollmar's counsel clarified that Vollmar is not pursuing a claim for failure to provide reasonable accommodation, and, in any event, Vollmar fails to raise a triable issue as to such claim.

First, to the extent her claim is based on assertedly poor ergonomics in her home office, the record shows IBM provided Vollmar with an ergonomic mouse, the sole piece of ergonomic equipment Vollmar requested. (See Vollmar Depo. at 45:18-23, 248:3-249:18, 250:24-251:15, 295:12-21.) Vollmar has offered no evidence suggesting IBM was aware of her need, if any, for additional ergonomic equipment or any other such accommodation and failed to provide it.

Second, to the extent Vollmar's claim is based on her not receiving a program manager assignment upon her return from disability leave, Vollmar, as discussed above, has failed to show any such position was available, and thus fails to show she was entitled to such an assignment as a reasonable accommodation. See Scotch, 173 Cal. App. 4th at 1010-11 (holding employee teacher's requested priority in course assignment in order to retain full-time employment not reasonable accommodation).[4]

Accordingly, IBM's motion will be granted as to Vollmar's Cause of Action for failure to provide reasonable accommodation.

### D. Retaliation

Under FEHA, it is unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." See Cal. Gov't Code § 12940(h). "[I]n order to establish a prima facie case of retaliation under . . . FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005). "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action." See id. "If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." See id. (internal citation omitted).

Vollmar asserts she was terminated because she took disability leave and complained that she felt she was the target of discrimination. In support thereof, Vollmar relies on evidence that, at an unspecified time after the above-referenced July phone call,

---

[4] As noted, IBM held Vollmar's position open pending her return. Vollmar does not argue IBM was required in addition to forego reassigning any particular responsibilities, e.g., program manager duties, within that position.

12

Vollmar complained to DiManno that she felt the call had been discriminatory, (see DiManno Decl. ¶ 17), and also made the same complaint to HR employees Dottie Robinson and Carol Simpson (see Vollmar Decl. ¶ 28; Vollmar Depo. at 367:20-368:3). Vollmar asserts the timing of these complaints and her termination, which occurred five months after her return from disability leave,[5] raise an inference of retaliation. See Loggins v. Kaiser Permanente Intern., 151 Cal. App. 4th 1102, 1113 (2007) (holding plaintiff may establish prima facie case "by producing evidence of nothing more than the proximity in time between the protected action and the allegedly retaliatory employment decision"). The adverse employment action, however, must follow "within a relatively short time" of the protected activity, see id. at 1110 n.6 (internal quotation and citation omitted), and intervals of three and four months have been found not sufficiently proximate. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting cases finding causal connection based solely on timing "uniformly hold that the temporal proximity must be 'very close'"; citing with approval circuit court decisions holding three-month and four-month intervals insufficient) (citations omitted); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (holding, for purposes of Title VII retaliation claim, three-month period insufficient to raise inference of retaliatory intent); Hughes v. Derwinksi, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding, for purposes of retaliation claim under Fair Labor Standards Act, four-month period insufficient to raise inference of retaliatory intent); see also Campbell v. National Passenger R. Corp., No. C05-05434 MJJ, 2008 WL 930992, at *9 (N.D. Cal. Apr. 3, 2008) (holding, for purposes of retaliation claim under FEHA, five-month interval, without more, insufficient to show causal connection).

     Further, even if Vollmar has established a prima facie case based on temporal proximity, IBM has offered evidence of a legitimate, nonretaliatory reason for terminating Vollmar's employment, specifically, the reduction in force imposed on Vollmar's department, and Vollmar has not offered evidence sufficient to raise a triable issue as to

---

[5] As noted, Vollmar does not specify the date(s) on which she raised her concerns.

pretext. Rather, Vollmar relies exclusively on the timing of her termination. Although proximity in time is sufficient to establish a prima facie case of retaliation, it is not sufficient to show pretext. See Delaney v. SimplexGrinnell L.P., No. CV10-05103 MEJ, 2012 WL 465177 at *6-7 (N.D. Cal. Feb. 13, 2012) (holding plaintiff "need[ed] other evidence besides temporal proximity to establish a genuine dispute with respect to the issue of prextext").

Accordingly, IBM's motion will be granted as to Vollmar's cause of action for retaliation.

### E. Failure to Prevent Discrimination and Wrongful Discharge in Violation of Public Policy

The parties agree Vollmar's causes of action for failure to prevent discrimination and wrongful discharge in violation of public policy are derivative of her other causes of action. Because, as discussed above, summary judgment will be granted on Vollmar's other causes of action, summary judgment likewise will be granted on these two causes of action.

## CONCLUSION

For the reasons stated, IBM's Motion for Summary Judgment is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: August 28, 2012

MAXINE M. CHESNEY
United States District Judge